# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-01073-COA

**ALFONZO LASHAWN McDONALD A/K/A**        **APPELLANT**
**ALPHONSO LASHAWN McDONALD A/K/A**
**ALPHONZO LASHAWN McDONALD**

**v.**

**STATE OF MISSISSIPPI**        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/16/2022 |
| TRIAL JUDGE: | HON. CHARLES W. WRIGHT JR. |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ZAKIA B. CHAMBERLAIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | KASSIE ANN COLEMAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 05/28/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1. Alfonzo Lashawn McDonald was found guilty of possession of a firearm by a felon in the Circuit Court of Lauderdale County, Mississippi. The trial court sentenced McDonald as a violent habitual offender to life imprisonment in the custody of the Mississippi Department of Corrections pursuant to Mississippi Code Annotated section 99-19-83 (Rev. 2015). Aggrieved by his conviction and sentence, McDonald appealed.

## FACTS AND PROCEDURAL HISTORY

¶2. On January 18, 2018, Detective Joseph Peters with the Meridian Police Department

obtained a "no-knock" search warrant for apartment 1733B of the Juju apartment complex in Meridian. According to the affidavit and the search warrant, law enforcement had probable cause to believe that several items stolen in a November 2017 house burglary (some of which were believed to have been used in two subsequent armed robberies) could be found in the apartment. At a pre-trial suppression hearing, Peters testified that he requested a "no-knock" search warrant:

> Because of the firearms, the number of firearms that w[ere] stolen from Mr. Brown's house and also other persons, informants, advised me that Alfonzo McDonald and Willie Starks w[ere] involved in an armed robbery in Tobacco World, and also the taco stand on 8th Street. So I considered them to be armed and dangerous.

At the suppression hearing, Peters testified that he enlisted eight other officers to assist in the execution of the search warrant.

¶3. At trial, Officer Dylan Peden testified that he was one of the officers who went to the Juju apartments to assist in the execution of the search warrant. He was employed as a patrol officer and was a member of the SWAT team. Peden testified that he knew that they were executing a "no-knock" warrant, so when he approached the apartment door and found it to be unlocked, he pushed the door open and entered the apartment. When he entered the apartment, Peden saw a black male, later identified as McDonald, sitting on a couch directly in front of him with a female sitting to his left. The female sitting next to McDonald was later identified as Katrina Stennis, the apartment's tenant. According to Peden, McDonald immediately stood and raised his right hand toward the officers. McDonald then "took a shuffle step to the left, and [Peden] put cuffs on him." Peden testified that there was a glass

table to the right of McDonald and a coffee table in front of him. Peden observed marijuana on both tables in "plain sight." He saw .22-caliber bullets on the glass table to the right of where McDonald had been sitting, on the opposite end of the couch from where Stennis was sitting. Peden stated that he did not know McDonald at the time but knew they (police) were looking for a black male suspect, so he handcuffed McDonald for officer safety. Meanwhile, other officers continued to search the premises for other people who may be present. While he was cuffing McDonald, Peden looked down and saw a firearm lying at McDonald's feet. Peden told the jury that he removed McDonald from the apartment and turned him over to another officer. Peden then went back into the apartment and recovered the weapon. He unloaded the .22-caliber revolver and handed it to Detective Rochester Anderson. Peden also identified the .22-caliber rounds that he recovered from the glass table that were within an arm's reach of McDonald as he was sitting on the couch. That was the extent of Peden's involvement in the execution of the search warrant. Peden said, "[T]he only thing I cleared was the initial living room. I never went beyond the living room."

¶4.     The only other State's witness at trial was Anderson. Anderson testified that after he arrived at the apartment complex to execute the search warrant, he parked and observed who was coming and going from the complex while he waited for the other units to arrive. When the other officers approached the apartment, Anderson went around to the back to watch for anyone who might try to leave through a back door. Once he knew, from radio transmissions, that entry had been made, he returned to the front of the apartment. He saw Peden standing with McDonald and saw Stennis still sitting on the couch. He observed "weed" and liquor

3

on the table in front of the couch. Anderson received the weapon from Peden, which Anderson placed in the trunk of his car. When he came back inside, Stennis said that the marijuana was hers because she had glaucoma. According to Anderson, Stennis never said anything about the gun. Anderson then left the scene to return to the police department to process the weapon. At the time he left, the actual search pursuant to the warrant had not begun.[1]

¶5.     At that point the State rested. McDonald's counsel moved for a directed verdict and renewed his earlier motion for dismissal for lack of a speedy trial, which resulted in the loss of body camera footage.[2] He further noted the absence of Peters who made the only written statement and was now unavailable for trial, although McDonald did not subpoena him. Those motions were denied.

¶6.     The defense then went forward with its case-in-chief. Stennis testified for the defense, and McDonald testified on his own behalf. Their version of events differed from that of the officers during the State's case-in-chief. Stennis testified that she and McDonald were both seated on the couch when the officers came into the apartment. According to Stennis, the officers kicked the door open and demanded that she and McDonald get on the floor. Stennis said that McDonald got on the floor. She testified that although she never saw the warrant, she knew they were looking for Willie Roger Starks and "a lot of weapons and stuff like

---

[1] Neither Peden nor Anderson was aware of the identity of any suspect or the specific items of stolen property that were the object of the search.

[2] According to testimony at trial, the body camera footage was preserved for a finite period of time and was no longer available at the time of trial.

that" from their conversation.

¶7.    The testimony was undisputed that Stennis suffered from vision impairment. When first asked about the gun on direct examination, Stennis testified that the firearm introduced into evidence belonged to her. Although the .22-caliber handgun had been admitted into evidence, defense counsel did not hand her the exhibit for her to make an identification. She stated that when the officers came in, the gun was in a "little drawer in the entertainment system." She said the entertainment system was right by the front door. Defense counsel asked her about the .22-caliber bullets, and Stennis testified that they were in a ziplock bag in the top of the closet in her bedroom. Later, also during her direct testimony, the following exchange occurred:

Q.    On that glass table, was there another kind of gun there? Something?

A.    No. It wasn't on the table. It was, like, a little sawed-off rifle that was, like, on the floor next to me. And when they came in, they was asking me about that firearm, and I told them that it didn't even work or nothing.

Q.    What was it, a BB gun?

A.    Something like that. I don't know what - - how exactly they called it, but I think it was like a sawed-off rifle or something, whatever they call it. That was the one they saw right when they came in, and that was it.

¶8.    On cross-examination, the State showed Stennis the actual gun that had been admitted into evidence and asked her if that was her gun. Stennis answered:

Listen, I don't know. I do not know. My vision, I haven't had no surgery. I have surgery this month. I'm not fixing to say nothing about is that my gun. I told you what gun was mine, the only gun that was found in my house.

Stennis continued to insist that the only bullets in her house were in her closet. She told the

5

jury that she did not take the gun out of the entertainment system and that she did not take the bullets out of the closet. She testified that she was going through a divorce and that McDonald had proposed to her. She also confirmed that she and McDonald were the only two people in the apartment.

¶9. McDonald testified in his own defense that Peden's testimony was not truthful. According to McDonald, after he dropped to the floor, one of the officers got him up, searched his pockets, and took him to the front porch where he sat with Anderson. A few minutes later, McDonald testified that Anderson asked him if he was a felon, and he answered in the affirmative. McDonald said that he was not told anything about a gun. At that point, Anderson put McDonald in handcuffs and took him to the police station. McDonald testified that he was unaware that Stennis even had a firearm, much less where she would keep it or its ammunition.

¶10. On cross-examination, McDonald admitted that he was a felon on the date of the search and confirmed that he and Stennis were the only two people present in the apartment. He denied that the officers found the weapon on the floor by the couch where he was sitting. McDonald also denied that he knew that Stennis owned a firearm.

¶11. The State offered no rebuttal testimony. The trial court read the instructions of law to the jury, and the jury heard counsels' closing arguments. After their deliberation, the jury found McDonald guilty of possession of a firearm by a convicted felon. After his post-trial motions were denied, McDonald filed his notice of appeal and raises one issue for our review.

## ANALYSIS

**Was the verdict against the overwhelming weight of the evidence?**

¶12. In his brief, McDonald argues that "Stennis, the apartment's owner, testified that the gun in question belonged to her. Stennis also indicated that at the time of the search, the gun was concealed inside her home, such that McDonald did not know of its existence. The overwhelming evidence shows that McDonald did not have knowledge of the gun or exercise dominion/control over the firearm; he is entitled to a new trial."

¶13. In *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017), the supreme court explained our standard of review concerning the weight of the evidence:

> [N]either this Court nor the Court of Appeals assumes the role of juror on appeal. We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury. Our role as [an] appellate court is to view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.

¶14. The testimony in this case presents a perfect example of the need for the jury to determine the credibility of the witnesses, weigh the value of their testimony, and resolve the conflicts in the evidence if they are able to do so. The testimony of Stennis and McDonald is diametrically opposed to the testimony of Peden and Anderson. The jury's verdict obviously indicates that they unanimously believed, beyond a reasonable doubt, the testimony of Peden and Anderson and resolved the evidentiary conflicts in favor of the State.

¶15. Stennis at one point testified that the only gun in the house was her gun in the entertainment system drawer. At another point she testified that there was a "sawed-off rifle"

7

on the floor next to her feet. At one point she testified that the gun found in the residence was her gun, but when she was actually shown the gun on cross-examination, she would not identify it as being her gun. She insisted that the only bullets in her house were in a ziplock bag in the closet in her bedroom. McDonald argued that because Stennis testified that the gun was in a drawer and the bullets were in a closet, he had no knowledge that Stennis even had a gun in the house. Therefore, he argues that he could not be in constructive possession of a gun he did not know was in the apartment.

¶16. While we agree that this is a case of constructive possession of the firearm, we do not agree that the jury was bound to accept the conclusions McDonald suggests. Instead, the jury found that Stennis' claim of ownership of the .22-caliber handgun was not true. Further, the jury found that Stennis' claim that the only bullets in the apartment were in the closet in the bedroom was also untrue.

¶17. The jury was properly instructed as to the elements of the crime of possession of a firearm by a felon. McDonald admitted that he was already a convicted felon on the date of the search. The jury was also properly instructed on constructive possession. Based upon Peden's testimony, the jury obviously found beyond a reasonable doubt that McDonald was aware of the presence and the character of the .22-caliber handgun and that he was intentionally and consciously in possession of it. While it was not in his actual, physical possession, it was in his constructive possession because it was subject to his dominion and control lying at his feet. Additionally, the .22-caliber bullets on the table closest to McDonald, which fit the .22-caliber handgun at his feet, was an additional incriminating

8

circumstance. *See Kelly v. State*, 305 So. 3d 1134, 1142-44 (¶¶26-33) (Miss. 2020).

## CONCLUSION

¶18.   Viewing the evidence in the light most favorable to the verdict, we cannot find that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.

¶19.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.  WESTBROOKS AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**